I think there's an issue that we need to discuss before we start the timer going, okay? Council? Yeah, approach, yes. Over there. It's okay. It's okay. You know, when I was a district judge, I was going to come up, you know, hold the microphone, chit chat. But the protocol is a little different up here. So welcome. Why don't you put in your appearance and then we'll talk about your motion or your motion. Oh, I'm sorry. I apologize. It's your motion. Quick get the papers. You you you made a motion on, I suppose, with regard to the video recording. I sent a letter. Yes, your honor. Well, my concern was simply that the there's certain aspects of the underlying record that are sealed. And but as you know, there's an audio recording of this. Unless you thought that your gesticulations during oral argument would be such that they might give away some some state secrets. I'm not sure what the point is. I misunderstood, your honor. I thought that the only public recording that would be put out would be the video and there would not be a separate audio recording. No, according to the letter that was sent and according to what our procedure and protocol is, there is a audio recording of every argument and there's a video now having voted on it as a court. There's a video recording as well. And the question that is put to us as a panel is, do we want to post the video recording? That's generally how it comes up. We can take your considerations under advisement. And when we make our decision, but we we understand the state's position and I think we are prepared to go forward. Thank you, your honor. Okay, very good. Now, come on down. Thank you. Did you bring family members here today? Yes, your honor. You did? How are you doing, folks? I knew who you were. Go ahead. Raise your hand. Who are the parents? Okay, wonderful. Listen, doesn't matter what he does. He did a great job. Fabulous. Welcome. Don't be embarrassed. Go ahead, sir. Your honors, and may it please the court. My name is Jim Davey. I represent the plaintiff appellant, Rahim Thomas. I would like to reserve two minutes for rebuttal, please. Very well. Go ahead. Thank you. Your honors, the district court erred in this case by failing to recognize the nature of the violation at issue and accordingly found that the defendants, whose sole responsibility was to consider his confinement in the dry cell and let him out when the security justification had lapsed, were not personally involved in the violations. Wonderful. You got it out. Here's a question that I have. Yes. The way this case is breaking down for me, there's up to June 4th and then there's June 4th going. Certainly. And I wondered if in your thinking about the case, you would concede that there's no viable duration claim or conditions of confinement claim prior to June 4th because there's no way to ascribe knowledge to the PRC members prior to that date. Your honor, I agree that there is a difference, that June 4th is an important date and is sort of a line of demarcation. But I don't concede that it's not possible for them to have been personally involved prior to that. OK, I don't want to spend a lot of time on it. Sure. But articulate for the record, if you would, how you could ascribe knowledge to the PRC prior to June 4th. Yes. So there's there's a line of doctrine and it's discussed in the brief about knowledge and acquiescence. And to the extent that they acquire knowledge of the conditions prior to June 4th and then don't do anything about it, that that's acquiescence for the purposes of personal involvement in a violation. What in the record demonstrates that they had knowledge of the conditions before June 4th? Well, some of the conditions are the type that carried on the whole the whole time. And one of them in particular that we're going to talk a lot about is being chained to the corner of the bed continuously the whole time. And according to challenging the policy that permits the handcuffing of the one arm with the periodic release and check by medical, are you challenging that policy or are you challenging how it was applied to your client? This is an as applied challenge. It's not a facial challenge. So I think it's possible to think of that particular violation as different for my client, partly because of his size. The fact that he was six feet tall meant that he couldn't stand fully upright. But one of the things in our case law that talks about restraints, talks about being viewed through almost an excessive force prism rather than an Eighth Amendment deliberate different prism. And I didn't really notice in the brief you really made that distinction. So are you asking us to make a ruling based on the handcuffing or are you looking at the unsanitary conditions that is also the subject of his testimony? To be clear, I think the actual consideration is per Rhodes and per Hubbard, the totality of the circumstances. It includes the cuffing or shackling, the denial of hygiene and a variety of other factors, including the constant illumination, the cold in the air conditioned cell, the lack of blanket, the dirty smock that was not changed out, the mattress. How is it that you attribute knowledge of the lack of blanket and the lack of toilet paper and the sanitizing wipes? I think those. So I think let's take them a little bit differently, because I think there are things that were that they could be inferred to have knowledge from because of the nature of the dry cell and their and their knowledge of the dry cell. And I think there are some other things that they could have observed in the moment when they were conducting the hearing from the front, the front of the cell. The fact that he couldn't stand the dirty smock and the mattress all are within observation. How do we know what we can see from the cell? There's nothing in the record even describes what's observable from the door. We don't know whether it's an open door. We don't know if it's a little window. Unless there's something in the record you could tell us. I certainly agree with that. But to the extent that it's not clear from the record at the summary judgment posture, I think that should be resolved in favor of my client and not in favor of the defendants. I think that assuming that there was a assuming that there was an interaction between the PRC members at the door of the cell with my client. I think it should be inferred that as in Baker and Baker in the Baker case, that particular officer wasn't even an eye shot of what was going on. It was it was an ear shot only. And so and he was still inferred to have knowledge of what was going on. And I think your client doesn't have an obligation to produce evidence, admissible evidence at summary judgment stage to say what could be seen. But the fact that there was a door and people were present, we should be we should draw that inference against the defendants. No, I think it's also true that he did attempt to tell them exactly about the conditions they was being held in. And that's that's a key factual dispute in this matter, actually. I think the judge's point is slightly different. OK, the judge's point is what we what may we infer they saw. Forget about what he may have told them. Yeah. Right. What may we properly infer that? I'm sorry that they PRC. So I think, again, at the very at the absolute very least, the fact that he could not fully stand upright. I think the fact that the fact that the smock was too small and was dirty and didn't close in front of him. I think you I think you can infer that they that they saw that. And again, on the summary judgment posture, I think in particular to the extent that there's a dispute, I think it should be resolved in favor of my client. I also think that the to the extent that the cell smelled of urine and feces, as there's testimony in the record that, you know, J one sixty nine. I think that's also that's also a fact that at this posture should be resolved in favor of my client in the sense of that being clearly evident, too. But I want to go back to your your original question sort of kicked this whole thing off about, you know, to the extent that there's a line of demarcation at June 4th. You know, we're talking right now about the pre June 4th stuff. But I think it's important to note that first June 4th itself there and they're continuing to hold him is a key part of the violation itself. Hope and a variety of other cases talk about the penological justification and and that when there is no penological justification, conditions that that would otherwise be justified by security interests are no longer justified. Do you think there's two different avenues to pursue under the 8th Amendment here? One is for the conditions intolerable pursuant to the 8th Amendment. And whether the continued confinement after June 4th without a penological justification also violates the 8th Amendment. So there's sort of two different methods by which an 8th Amendment violation could be pursued. Yes, your honor. Are you pursuing? I think that's right. I think both. I think, frankly, again, because as roads and hope. Right. Would you say you played both? Yeah. And as roads and and Hubbard v. Taylor Council, it's it's a consideration in the totality of the circumstance. And did the district court draw that distinction? The district court, as far as I can tell, did not draw that distinction. And again, I think the district court, the district court specifically defined the right at issue. And this is one of the reasons that the district court was in error to find the right at issue as as, you know, in compliance with policy. And that's that's wrong for a few reasons. I mean, number one is that as even the defendants concede they did not comply with the policy fully. But moreover, the right at issue and the ways that they did not comply with policy extend to holding him past June 1st when the X-ray happened. But certainly June 4th, when these particular defendants had knowledge that he had had 12 contraband free bowel movements and that there was a clean X-ray and continued holding him anyway. Tell me where in the record we know what they actually reviewed, because we the deposition transcript doesn't really disclose from Mr. Miller, Mr. Tice, what they reviewed. There are representations in the brief, which I'll be asking about. But what in the record can we point to to say they were on notice of the results of the X-ray? They were on notice of the clear bowel movements. I'm aware that that it occurred. Questioning again, it goes back to the knowledge of the PRC. Right. So, first of all, the the to the extent that they've said, I mean, the defendants in some ways are trying to have it both ways here. They've they've said at one point that they should have knowledge of all of the medical checks that happened to show that they knew that things were fine. But also their brief. We only know that from their based on their brief. Absolutely. But they but they they they would like the benefit of the medical checks that that have allegedly showed them that things are fine, but would not like to also be held accountable for the the the record of the 12 contraband free bowel movements, which are also in those same medical records. Similarly, the the clean X-ray at J.A. 162 and J.A. 314, J.A. 162. My client testified to having been told by staff that he had had a clean X-ray. And I could seem to be Taylor, which is not in the brief, but is 316 after 257 at 270, which is a decision from this court in 2003. It makes clear that even the deposition testimony of one prisoner witness is enough to defeat summary judgment. And to create a genuine dispute of material. Is there anything here? Here's the trouble that I had with regard to the PRC's knowledge. It appears that there is no reference in the record to support the notion that the PRC knew anything about the X-ray. Right. So going to pediological justification, Tice, Tyson Miller. Yeah. Say they don't remember why we kept him. Garmin's the the only knowledge with regard to Garmin is. Whatever it is, six weeks, two months later. Yeah. And that cuts in favor of your client and the. There's nothing with regard to the fourth defendant. So I have a couple of answers to that. The first is that even under the dispute as to exactly what he told them when they when they showed up at the cell, even under, even assuming that that's disputed, he they say that he didn't tell them about the conditions. And that's that's disputed. And that and that's fine. He admits he didn't tell them about the things that he didn't have. Sure. Although, again, I think that, you know, the shouting at them down the hallway is a dispute. But for the narrow purpose of trying to tell them that he did not have contraband in his system and that he had had a clean X-ray, he was attempting to tell them that. And that's it. You know, the magistrate judge who wrote the good R&R notes that at J33. And again, I would draw your attention in particular to J175 and J201 about the fact that he attempted to tell them about the fact that he was contraband free. Even even in that that section of the deposition, that's not clear as to what he was telling them. It's clear that he was prioritizing trying to tell them that he was contraband free, that he had had clean X-ray and they should have gotten out. And that and that puts that gives them even if you don't impute to them the knowledge that apparently everyone else in the facility had. But the X-ray had been clean. Him trying to tell them, you know, the Hamilton case in this circuit, you cannot fail to conduct even a rudimentary investigation when you're when you're on notice or something like that. And so the fact that he tried to tell them, again, at summary judgment, I think is more than enough to create a genuine dispute of material fact as to whether they had knowledge of that at the time. And that's, again, entirely separate from the fact that they knew that he had had 12 contraband free bail movements. Judge Greenaway, I would also like to say you had sort of gone through the defendants. Number one, the defendant that you did not know where you said, oh, you know, it's not not as clear. The Major Halderman. Yeah. Major Halderman. He testified. She's a major. And as a result, has has other responsibilities. He testified at Jay 173 that she came by the cell on several occasions. So especially as to as to the conditions. But but as to this, she maybe had the most interactions with him of any of the defendants. And in addition, in his deposition, when he's describing recognizing Halderman, does he does he testify? I told Halderman about the conditions I was. I'm subjective. I'm not I'm not sure that that's exactly clear from the deposition, but it is. It is true that he was at. It is true that she had a number of interactions and even outside of the PRC. You've mentioned on a couple of occasions that 12 contraband free bail movements. Yes. I have my own personal intuition about 12 contraband free bail movements, but there's nothing in the record that helps us to that tells us what the significance of that is from a medical perspective, from a pedagogical perspective. We have testimony by I forget if it was ties or someone else on the other side saying, oh, I've seen 10 days worth of bail movements. And and and it took that long. So I don't I'm not sure what to do with this 12 bail movements. Can you help us? I can't. I see that the red light is on, though, if it's OK, if I get a suggestion. So I actually think that the ties, the ties, the testimony that you're talking about, actually, I think is really important in the sense that it's very unhelpful because it is not made. That testimony was not made in reference to my client in particular. He says that that's the longest that he's that he's seen someone. And that was not made in reference to an inmate who had taken, as my client had, an enormous dose of laxatives in an attempt to help himself get out of the cell. If you're if you're you know, if you take laxatives and take other affirmative steps, it's not clear that it's not clear from his testimony, certainly, that the inmate in question that he's talking about, who took as long as 10 days, had taken 10 laxatives or had 12 contraband free bowel movements. And again, to the extent that there is a question as to whether or not, you know, what the significance of 12 contraband free bowel movements or 10 days is, that should be resolved in favor of my client on the summary judgment posture. I think it's I think it's more than more than disputed that 12 contraband free bowel movements is evidence that you have had a number of opportunities to pass all the contraband out of your system and none, none was there. And again, that's even as of June 4th, when the PRC defendants made the decision to continue holding him. Do you have do you have additional questions or I can come back on rebuttal? Yes, you will. Okay. Thank you. Good morning, Your Honors. May it please the court. My name is Sean Kirkpatrick with the Pennsylvania Office of Attorney General here on behalf of the Program Review Committee appellees. And the district court correctly granted summary judgment in this case because there, as my friend does very well, his argument is based upon a conflation of the PRC and security and medical. And what's key here and what the district judge correctly keyed in on was the fact that the PRC did not know until June 4th, quite frankly, that he was even necessarily in or at least there's no evidence that of that the PRC knew Mr. Thomas was in administrative custody until June 4th. OK, so I get that argument. Let's assume for the purposes of our discussion that we're going to look at June 4th going forward. I'm sure that myself and my colleagues will have other questions pre June 4th. But for purposes of our discussion right now, June 4th. OK, let's. I'm sorry. The question's coming. Did you you were going to say something? I was I was going to move into my argument. I apologize. Oh, no, don't do that, because we have a couple of things coming first. OK, so the key here is what's the peniological justification? Presumably it's the X-ray post June 4th. And here's the the things I'd like you to work through. The question is, what knowledge can either be imputed or ascribed to the PRC? The knowledge that probes have, whatever, whatever that knowledge was, he says in his declaration that the medical department informed him that Thomas's X-ray revealed a foreign body. It appears that the record, when you look at the radiological report, that that's the reference to the bullet that's lodged in his body. But it doesn't say in the report that it's a bullet. But in any case, that's what Probst says. But there's nothing in the briefs, in the record that I can discern. Maybe, you know, differently. That says that Probst somehow relayed that knowledge to any of the four people on the PRC. And I I'm not aware, maybe you could help me, of some legal machination that would allow that information from Probst to be ascribed to them. That's number one. Number two, defendants Tyson Miller testified in their depositions that they did not recall why they decided to continue the confinement. And apparently none of the four defendants wrote down any rationale, which apparently is violative of an administrative policy that the DOC has. But I think that's a side issue. We alluded to earlier what Garman conceded in his review on the administrative grievance that once the X-ray failed to reveal any obstruction and several bowel movements occurred, Thomas should have been released. Now, unless I've missed something and you're going to help me with that. That's my understanding of the state of the record with regard to the knowledge of the PRC, June 4th, going forward on the X-ray. If that's so, then what could the peniological justification to keep Thomas in after June 4th, what would it be? Since Your Honor began with Probst, so shall I. And what the record shows is that an X-ray was done and the X-ray speaks for itself. Is the X-ray in the record? Yes, Your Honor. Do you mean the radiological report? You're absolutely right, Your Honor. I'm sorry. I apologize. The radiological report and that is actually a very key difference because what Mr. Thomas testified to was that the woman who took the X-ray told him that she found a bullet. The X-ray, however, as we all know, because we spend $1,000 an hour to have a radiologist look at the X-ray, was done by a Dr. Lu who wrote the report finding an eight millimeter foreign object. That report was not read by my clients because my clients aren't doctors. They wouldn't be able to read a radiological radiology report. That was, as the report says, and this is 284, it was read by Christina Dahl, M.D. She works for NCS Health Care, which is the- I mean the radiological report's in English, right? I mean- Well, yes, there are certain kinds- The bowel mass pattern is unremarkable without large or small bowel dilatation or obstruction. There is soft tissue mass or pathological calcification. There's an eight millimeter opaque foreign body over the gastric region. Now, some technical terms in there, but help us with the knowledge. That's why they have doctors to look at that and then to inform security. What is the evidence to show that that information was relayed to our four defendants here? Security Captain Probst, in his declaration, said that medical told him- How did the information from Probst get to the four defendants? Although my defendants did not provide a detailed explanation in the report, they did indicate that it was still ongoing investigation. That there was still an investigation ongoing- They checked the box that said continued investigation, and they cited to the provision within the ADM. That was based upon- In the policy- I'm sorry. In the policy, the way this works is the PRC will take recommendations from security and from medical. We have to infer because the policy says they take recommendations from there, they must have taken recommendations from there. Based upon the fact that Security Captain Probst said that security had this knowledge, yes. Because in your brief you say- Sorry about that. In your brief you say that the PRC would have had access to the medical information, et cetera, but there's nothing in the record that tells us, in fact, they did. And do you want us to just accept your statement that they would have, Or should we infer the opposite, which would be to construe the evidence in the light most favorable to the non-move ant, which is they didn't, that would be a dereliction of duty, because how could they make a knowing decision to hold him in continued administrative confinement in the dry cell? So doesn't that fact hurt you? Does silence in the record hurt you? Yes. Typically, with representing the Commonwealth, silence in the record usually hurts us. You make a very fair point, Your Honor. What can I believe be inferred is the knowledge, however, that Mr. Thomas was being seen per policy by medical staff every two hours. We can see that from the log. Well, we can see that from the log, but even if the PRC didn't look at the log, and I'll accept Arguendo that they didn't look at that, they knew that medical was treating him, and the case law, Sproul v. Gillis, an official may rely upon the medical treating an inmate, that that treatment is proper. And that's where this conflation, I think, causes problems, because you have the investigation is not being done by the PRC. The investigation is being done by security. I'm going to interrupt you, and I'm going to beg your pardon, okay, because I think you're getting off of the topic that we've been questioning you on, and I want to bring you back. Okay. And I'll give you whatever time you want to get back to what you were saying, but I think it's, at least for our purposes, a little off the topic, okay? And so what I want you to specifically come to is the X-ray point seems to me to be the key factor here, because if you cannot appropriately or properly impute knowledge of the X-ray to the four PRC members, there's no peniological justification, and I think that that takes care of, if you will, the duration claim. So with that in mind, do you now concede? It appears that you do. I could be wrong, but it appears that you concede based on Judge Schwartz's questioning that there's no evidence that the knowledge of the X-rays would be imputed to the four PRC members. I understand that you might argue that you can impute knowledge that Thomas was being treated every two hours or seen periodically, but that doesn't speak to the peniological justification. So help me on that specific point. The policy provides that as part of the PRC hearing review that they talked to security. But we know that there were derelictions of the policy, so if you want us to do this on this point, then that means every time it goes the other way, we should do the same? I don't understand. Well, no, Your Honor. If at the end of the day this Court finds that there is no evidence to suggest that the PRC ever spoke to anyone before they made their decision, then I will concede the point. But the normal course of operations has to be taken into consideration, and they wouldn't even know why he was in there unless they talked to the department who was actually conducting the investigation. And so they wouldn't even know that an investigation was ongoing if they didn't talk to the department that was conducting the information. So if we can, unless this Court is willing to infer that they just came in, they didn't talk to anyone, and without any knowledge they checked some boxes, then yes, I have to concede the point. But I don't think that that is a fair inference. That's certainly not what I believe Security Captain Probst was saying in his declaration. And so once again, the X-ray itself I think is a red herring, because to a certain degree it doesn't matter what the X-ray actually said. It's what was relayed to Security, which was part of this process. And... Well, the record on this isn't entirely silent, because we have the testimony of two of them, right, who when asked why did you keep him in the dry cell after June 4th, they didn't say, we heard about the X-ray report or we talked to Security. They said, I don't know or I don't remember. Yes, Your Honor, because it was two years after the fact. And the PRC doesn't just handle swallowing cases. They handle suicides. They handle self-harm. They handle protective custody. They handle misconduct while other investigations are happening. They see a lot of these cases. So what's the purpose of the PRC? Is the purpose of the PRC in this circumstance, whether it makes, if there's a reason to continue the administrative segregation, or is it something more? What is their role? What is their purpose? Their role is to be a check on security, to make sure security doesn't keep a person in administrative custody, one, for no reason, and two, for too long. So are you explaining to us that the PRC is not checking to make sure the conditions of confinement are commensurate with the policy or Eighth Amendment standards or anything like that? Are you telling me that that's not their job? Yes, Your Honor. Thank you, Your Honor, and I will cite to the court opinion at page 12. Which one? The district court? The district court. I'm sorry. The district court's opinion, and that comes from the policy itself, which is the conditions, because this cell was in the infirmary, the conditions are being handled by essentially medical. The investigation is being handled by security. Is there something in the record that would tell us this cell is in the infirmary? Yes. That was Mr. Thomas's deposition. So the plaintiff described it as being located in the infirmary. And I cite, instead of me running through my brief, I cite it in the brief, Your Honor. Okay, and is there anything in the record that describes, if it's in the infirmary, what one can see when one comes to the door? Because we had someone testify they came to the door. I believe that Mr. Thomas testified that there was a window, but as to how big of a window, I don't believe that is in the record. Please help us. You mean there's a window that is the door to the cell? No, no, no, Your Honor, that there is a window in the door. But no evidence concerning the size, whether it's enough for the eyes or something. That's exactly right. Now, Mr. Thomas testified that he spoke through the door to the PRC. And I see my time has elapsed. No, don't worry, because I have more questions, and it looks like Judge Porter does as well. I don't doubt. He testified that he spoke through the door, and as the district court correctly related from the testimony, he did not at any time complain about the conditions of his confinement to the PRC. Now, the PRC is not responsible for the conditions of the confinement, but I would concede that had a complaint been given to them, it is their obligation under the policy to then take that complaint and make sure it gets to the correct people. Okay, fabulous. So if that's the policy and that's their obligation, what's in the record is that Mr. Thomas was yelling complaints. So there's nothing in the record that says, and correct me if I'm wrong, but there's nothing in the record that I can recall that says they didn't hear him yell. No, that's correct, Your Honor. Okay. And as I understand the record, in your statement on undisputed facts, you say in Paragraph 21, during the administrative hearing, the PRC explains why the inmate has been placed in administrative custody and the inmate is granted an opportunity to respond. The PRC then determines that continued placement in administrative custody is warranted. So may we properly infer by that that the purpose of going to the cell is twofold. Number one, it's to have a conversation with Mr. Thomas, and number two, it has to be in part to see the conditions, otherwise they couldn't possibly make a determination if continued placement in administrative custody is warranted. I mean, you'd agree that if the PRC's purpose is to see Mr. Thomas and talk with him and the purpose is to determine if continued placement in administrative custody is warranted, they'd have to look. I mean, suppose he was naked in the corner and nothing else in there. I mean, it would be on them to determine whether administrative custody was warranted. So can't we appropriately infer that they must have seen the conditions in which he was in in order to have a conversation with him? No, Your Honor, and here's why. Okay. When we discuss about whether continued confinement in the administrative custody is warranted, that doesn't go to conditions because that's not the PRC's purview. That is whether the justification originally remains and, as we argue, based upon the security saying that medical found a foreign object in the gastric region and that there was seven bowel movements before the x-ray and five after and they haven't found that foreign object yet. There's no evidence that anyone told security or the PRC that this might be a bullet that is lodged somewhere in the gastric region. They used that and said, okay, well, seeing as there is a foreign object and we haven't received it, we haven't recovered it yet, does it make sense to continue the administrative custody for a short, you know, sometime thereafter? That is the determination that they're making. Whether the conditions, whether the infirmary guards are not doing what they're supposed to be doing, whether the medical people who see him every two hours are not doing what they're supposed to be doing, that is not within the purview of the PRC. Although, because an inmate in his situation obviously doesn't have any pieces of paper, he can't file a grievance, the PRC is the place that if you have a grievance, you're to bring that up to him. But that isn't their focus. Their focus is, is this person still suicidal? Is an investigation still ongoing? If this person is self-protection, is that danger to this inmate still ongoing? Well, focusing then on what you've identified as what the PRC's purpose is, how do you get over the fact that Defendant Garman is alleged to have said holding him in that continued dry cell after the PRC visit was improper? I mean, how do you overcome that for the purposes of summary judgment? That's not exactly what he said. I'm only recounting what he said in his grievance. What he said was that the, because the X- Well, tell us where you're reading from, because. I was going to do it from memory, but that's probably a better thing to tell you. We love your memory, we do. No, no, this is 314. One moment. I can read for you. However, once the X-ray failed to reveal any obstruction and several bowel movements occurred, you should have been released sooner. That's in the facility manager's appeal response at 314. And then in the final appeal decision, it reads at 8-316, the following quote is indicated by Superintendent Garman. Once your X-ray failed to demonstrate that any, demonstrate any contraband and you failed to eliminate any contraband, you should have been released from dry cell placement, and for that reason your grievances have held in part, close quote. Absolutely, Your Honor. So how do you overcome that for summary judgment? Because the second one misquotes the first one. And the first one, Deputy Garman. What he said was that the X-ray, which. Now, where are you getting that from, what he actually said here? He said in 314, once the X-ray, which at this point clearly he must have seen, failed to reveal any obstruction, not foreign body, and several bowel movements occurred, that isn't necessarily the bowel movements before June 4th. I see. So you're saying that we can't read this as what he knew on June 4th. I think you're saying this only reflects his knowledge as of the date of this document, which is August 21st, 2015. Much better than I could have said. And quite frankly, it cannot be used to infer his knowledge on June 9th either. I don't get that at all. Help me. Because once the X-ray failed to reveal an obstruction and several bowel movements, so we know on June 4th there had been an X-ray on June 1st. We know that there had been five subsequent bowel movements before June 4th, the visit of the PRC. You should have been released sooner. Now, that means that when he was released on June 9th. I'm sorry. Yeah, right. He was released on June 9th. So if he should have been released sooner, that means he should have been released before June 9th. Yes. And that's what Deputy Garman is saying after the fact, having been provided new information. Yeah, but you want us to infer from the probe's declaration that he had knowledge of, that the group of them had knowledge of the X-ray information, right? I thought that's what you asked us to infer. And that knowledge would have included, presumably, the presence of a foreign object above the gastric area, something along those lines, right? So I'm not sure how I can reconcile what you want me to infer from probes and what the officers knew or the defendants knew on June 4th with what was said around August 15th or memorialized around August 15th. Here's the distinction, Your Honor. Captain Probst did not say that he relayed all the information from the X-ray. Right. I think, yeah, we agree on that. What he says, or that medical relayed all the information to security. What he says is that medical said, told them that a foreign object had been found. That's it. Nothing about a lack of obstruction. So we have an individual who is looking back at the situation and saying that, had I to do it over again, maybe I would do it differently. And that, quite frankly, gets us into Beard v. Banks territory, where it's not a dispute of fact so much as a disputed matter of professional judgment. And there should not be, we should not make prison officials afraid that if I err on the side of security, I'm going to get sued or that I'm violating the Eighth Amendment. Especially where, here, the conditions complained of that the PRC knew about the handcuffing and the smock and all that was not clearly established as violating the Eighth Amendment. Now, this is a very, and I'm going very long on my time, so please stop me at any point. I think Judge Porter has a question for you. I do. Two questions. Just so I'm perfectly clear, on June 4th, with respect to, I don't care about conditions for purposes of this question. It's all about duration. On June 4th, when the PRC decided to keep him in there, the sole justification that they had was that there was a foreign, that the radiological report indicated there was a foreign body in his abdomen, right? Is there anything else? Based upon the evidence, no, Your Honor. And is that, was that, that was not contemporaneously recorded anywhere? We only learn about that through the Burbs Declaration later, right? That is correct. Okay. My next question is, I'm going to ask you the same question I asked your friend, which is how do we, without any medical evidence or any evidence, how do we process the fact that there were 12 obstruction-free, contraband-free bowel movements? Well, I don't believe that that is a proper question to ask a jury because the jury is without any kind of medical evidence that says that this is impossible. It's so impossible that there could have been anything that only the most incompetent official would have thought otherwise. I don't believe that the court should or that we can draw a straight line and say, we're going to count bowel movements, and when you hit a certain point, then you have to let them go regardless of anything else. Biology, there are no clear lines in biology. And so if this case was a situation where Mr. Thomas's attorney had gotten a medical expert or any evidence to suggest that the number of bowel movements was way beyond human possibility, then I agree there's a fact question. But they don't have any, there's no evidence on that. The only evidence we have is the testimony by Superintendent Tice that based upon his experience, he has personally seen an inmate take more than 10 days, which, you know, as all evidence, I'm sure is self-serving. It is under oath, so it is true. But that's the only evidence we have here. And so I don't believe there is a dispute of fact because there's evidence on one side and there's nothing on the other. I just have one last question. Tell me how you distinguish this case from Young and what is the application of Young here? You put aside the HIV and so forth on the other. Okay, Young is different because this is not a situation in which Mr. Thomas is having to defecate in a corner. The testimony is clear that every time he used a bedpan, it was taken away within minutes. Every time he used the urine bottle, it was taken away within minutes. How do you say the evidence is clear when he provides testimony that's in conflict with that? Well, that's his testimony, Your Honor. No, I understand, but we're talking about whether a genuine dispute as to material fact is present, and if so, then it should go to a jury. So, I mean, that's what we're struggling with, right? I mean, how is something definitive if there's a genuine dispute? I think it becomes very problematic, Your Honor, if the plaintiff can create the dispute of fact within his own testimony. Then you could always defeat summary judgment. So we have to look at his testimony and take it as true, and he says that at no point was he ever denied a bedpan, that the bedpan was taken within minutes. He's talking about eating with defecated, ridden hands. Okay, that is a different matter. That, the question becomes, did the P Program Review Committee know that? Now, looking through a window, you would not see a lack of toilet paper, because there wouldn't be any toilet paper in there, because there cannot be anything in there for him to use to hide or destroy the contraband. That's the whole point of the tri-cell. Same thing with hand-sanitized wipes. So unless the PRC was watching him defecate and then eat, and there's no evidence that they did, there's no evidence that they would have known about not providing sanitation wipes. And, again, I go back to the reasonable reliance that this is an inmate, and this is why this is distinct from, quite frankly, most, if not all, of the cases that both sides cite. This is a situation in which medical is seeing him every two hours, and the PRC can reasonably rely, absent some evidence to the contrary, that that is, in fact, occurring. And I find it telling that my friend cites 20 cases, and I distinguish them. I cite 20 cases, and he distinguishes them. That tells us there is no clearly established law on this issue. Otherwise, we wouldn't have five to six pages of table authorities in each of our briefs. Thank you so much. Thank you. I would like to make two main points on rebuttal, and then I have a couple of sort of subsidiary points. First, cutting through everything that my colleague just said, even if what he said is a plausible description of what might have happened, it requires a telescoping series of inferences, all to be construed against my client at the summary judgment posture. One of them is, you know, that the X-ray itself, which said that there were no bowel obstructions, and that merely there was a foreign body, that the foreign body could be inferred to be obstructing the digestive tract. It requires an inference that the person who told my client that it was not an obstruction, and that it was otherwise clean, and that it was a bullet, didn't tell anyone else. It requires an inference that the security officer, Officer Probst, did tell them, and there's no evidence of that. It requires the inference that even if they had all of this knowledge, you know, with the 12 bowel movements and all of the other evidence about the X-ray, that they interpreted that in a particular way. And even aside from all of that, there's still evidence that my client tried to tell them at the cell door that he had had a clean X-ray and shouldn't have been held there in the first place. And I would again direct your attention to JA-175 and JA-201 for that purpose. I would add that the duration, you've talked a little bit about duration. Even if you don't buy that they had any knowledge of the conditions in the first four days, I do think that duration is still important, because the violation is different on the second day than on the eighth day. And so even if you're only looking at the period of June 4th to June 9th, those are not just, it's not just a five-day duration, it's days five through ten. And so the conditions are substantially worse. There are a lot of cases that talk about, you know, severity required, like the Wiley case, for example, talks about how the severity of a violation decreases as the duration of it gets longer. So your view is I have a duration claim June 4th to June 9th, and I have a conditions claim May 31st to June 9th? My, so sort of. My position is that there's a conditions claim the whole time. Obviously there are, the knowledge is clearer as to, you know, June 4th and subsequently. But the conditions claim exists the whole time on the basis of knowledge and acquiescence even as to the first part. But my other point, or I guess as to the duration specifically, obviously, you know, if he's only in the dry cell for ten hours or something, the duration claim is a little bit harder to make out. Ten days is a long time. Five days is still a long time. And then even within the duration claim, the fact that it was days five through ten, days five through ten are worse than days one through five from the experience of the prisoner and in the law. The second point, the second overarching point that I wanted to make on rebuttal is, again, to go back to what the scope of the violation is here. My colleague mentioned that it is not the responsibility of the PRC to check for compliance with the Eighth Amendment, which is a concerning statement if you think about the responsibility of prison officials and the Eighth Amendment guarantee that prisoners will not be subjected to cruel and unusual punishment. Hope itself, Hope v. Pelzer, which is, you know, we've cited and is a seminal qualified immunity case in the sense that even 15 years ago, the Supreme Court said that those defendants themselves could not get qualified immunity. Councils that conditions that would otherwise be justified by security justification are not justified if there is no legitimate penological reason or investigative reason to subject an inmate to those conditions. And this case, though, is the record has developed easier for you on just a duration claim rather than the conditions claim, because of the challenges we've already discussed about how you prove what they knew and when they knew it. Is it easier? Easier cause of action for you to argue to a jury about the continuation claim? I'm not certain what would be easy. It's hard to know what would be easier to argue to a jury. But I do think, again, I think there is a conditions claim. I think there's a duration claim. And as we've discussed at the outset, the very fact that they held him without justification, the conditions that they were holding, dry cell conditions as a general matter, would fall below the baseline required by the Eighth Amendment. If they were not justified by a legitimate investigative. I want to make sure you're not asking this court to say dry cells are unconstitutional. No, no, Your Honor. No. In fact, the key point is that those conditions may be justified in many circumstances. By a legitimate investigative basis on a belief that there's contraband. The problem is when, as here, it becomes clear very early on that there no longer is an investigative basis. And again, in this case, that's that's made out by the x-ray that shows no obstruction. The 12 clean bowel movements and him attempting to tell them that and other people in the facility having told him. But I guess we're supposed to infer it summary judgment, not told them that when the investigative purpose lapses, there is no longer a basis to hold someone in those conditions. And again, as Hope says, when there is no longer a justification to hold someone in conditions that would otherwise fall below the Eighth Amendment baseline, that makes out an Eighth Amendment violation. So there's there's a there's a duration issue. There is a holding him there in the first instance once the justification is lapsed issue. And there is a duration issue. And I think those are all very important. I also would very briefly like to talk about qualified immunity just because it came up again at the end. I think that regardless of, you know, how many cases either of us have cited, the the case law makes clear that, number one, if you hold someone without justification in conditions that violate the Eighth Amendment, that's a that's a violation. Number two, you pointed to the young case, and I think the young case is very helpful for us. If you hold someone in these particular conditions, that makes out a violation over over a certain duration. And and the case law that they cited, the case law, the defendants have cited purporting to say that the policy is constitutional. For one thing, says nothing of the kind. And for another thing, even if it had, they didn't comply with it. And beyond that, even if they had complied with the policy and even if the policy had previously been upheld against facial challenge, the relevant standard here is the Eighth Amendment. The Eighth Amendment, like the policy and qualified immunity. Sorry. For purposes of qualified immunity, the defendant standards, the defendant's conduct is judged against the relevant standard. And that is the Eighth Amendment. And there are lots of cases that put them on notice. Young young being among them, but there being many others, lots of cases that put them on notice that that the conditions and holding him without justification and holding him for as long as they did without justification violates the Eighth Amendment. I'd like to ask you about the subjective test and articulated in Farmer. Yeah. Which is that officials have to both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists. And they must have drawn the inference. I've heard you talk about some facts and about inferences that could be drawn. But but I haven't heard you tell us how how you know that the present officials drew those inferences. Certainly. So the Hamilton, which is which is a case in the circuit, says that if you have knowledge of conditions that may make out of violation, you conduct no investigation. That makes that that may make out of violation. And the reason is that if they have knowledge of a potential violation, they can't absolve themselves of liability by conducting no investigation. The beers capital case, which is which is also from the circuit, points out that you can infer from circumstantial evidence that they had knowledge. And this the record is replete with circumstantial evidence as to the knowledge that they had. And again, I would remind you that this is on the summary judgment posture and that all the inferences that you're that we're talking about here should be construed in favor of my client on this posture. And so the, you know, Hamilton, the fact that they had the knowledge and didn't do anything about it, that should be construed in favor of my client as to as to what they did or didn't do. For the purposes of the subjective part of the test and beers capital, that the circumstantial evidence can show about the knowledge they had and all the evidence that should be construed in favor of my client makes out the objective part of the test. And so I actually think that, you know, both the objective and the subjective parts are are more than satisfied. The the the form that the PRC completed after the June 4 meeting, the D.C. one forty one. Yeah. Jay to one. I can't tell from the record whether Mr. Thomas received that form. The reason I ask is because there is it says you can appeal this within two days. I wondered why. If he received it, he disagreed. Why didn't you appeal? So that's actually it's a it's a very Orwellian kind of thing on their part in the sense that when you're in the dry cell, you're not allowed paper, not allowed pens. You're not allowed any writing utensils. There's not a desk. There's not anything. And so if they if they did that, if they undertook that action on June 4th and he was confined to the dry cell until June 9th, it's not it's not actually possible for him to have done anything about that in two days. He did what he could do, which was complain to them orally and try to tell them why it was not justified that he was being held there. But he couldn't he couldn't possibly have filed a written appeal of any kind within two days. And I don't think that it would be fair to hold him to that. Doesn't say it has to be in writing, just says you can appeal. I don't I don't know if he even saw this form. So I mean, I think there's I think there's record evidence that he didn't until later. And again, to the extent that it only requires an oral appeal, him attempting to tell them why it was no longer justified to hold him and then turning and walking away. I mean, J.A. 223, he he writes that they when they when they came to the cell door, they already had their minds made up and that that was his that was his impression of what was going on. And if they already had their minds made up, that is exactly the sort of refusal to conduct an investigation into the possible circumstances of a violation that that Hamilton counsels is is a violation of the eighth amendment. If you have nothing further, I'll I'll sit down. Thank you. Counsel, thank you for spirited arguments and we will take this matter under advisement and question. Thank you. Thank you. Thank you.